**LOCAL 198, UNITED RUBBER, CORK, LINOLEUM & PLASTIC WORKERS OF AMERICA, AFL–CIO, Plaintiff,**

v.

**INTERCO, INCORPORATED, a Corporation, Defendant.**

**No. 67 C 134(2).**

United States District Court
E. D. Missouri, E. D.

Aug. 6, 1968.

John H. Goffstein, and Levin & Weinhaus, St. Louis, Mo., for plaintiff.

J. Terrell Vaughan and Walter M. Clark, Fred Leicht, Jr. and John P. Emde, St. Louis, Mo., for defendant.

## MEMORANDUM

MEREDITH, District Judge.

The plaintiff, Local 198, United Rubber, Cork, Linoleum and Plastic Workers of America, AFL-CIO, is, and was at all times material, an unincorporated association, and it formerly represented production and maintenance workers employed at defendant's plant in Hannibal, Missouri, in the manufacture and fabrication of products of rubber, plastic, and other similar materials. The defendant, Interco, Incorporated, formerly known as International Shoe Company, is a corporation whose principal office is located in St. Louis, Missouri. The plaintiff represented no employees but those at defendant's Hannibal plant. During all the times in question, the employees at defendant's Bryan, Texas plant were represented by another local union, which was affiliated with the same international union as Local 198. The plant at Hannibal, Missouri, was engaged in interstate commerce. Plaintiff is a labor union as defined by the Labor Management Relations Act, and defendant is an employer engaged in commerce. This Court has jurisdiction of this cause of action pursuant to section 301 of the La-

bor Management Relations Act (29 U.S. C. § 185).

Plaintiff and defendant entered into a written collective bargaining agreement which was to remain in force from June 1, 1964, through May 31, 1966, and which by its terms was automatically renewable thereafter from year to year, unless terminated upon timely written notice given prior to the anniversary date of such termination.

During the collective bargaining negotiations between plaintiff and defendant, which resulted in the foregoing contract, defendant notified plaintiff that the Hannibal plant was forty-three years old and running at only twenty-five percent of production, that the Bryan, Texas, plant was about ten years old and running at seventy percent of production, and unless some adequate solution could be arrived at, the Hannibal plant would have to be closed, and part of the work shifted to the Bryan, Texas, plant. The Bryan, Texas, plant was all on one floor, the Hannibal plant was a three-story building. Between 1955 and 1965 International Shoe had closed approximately twenty-five to thirty plants and its daily production of shoes had decreased from 240,000 pairs to approximately 120,000.

After negotiating the 1964 contract, the union suggested the possibility of having the City of Hannibal build a new plant. There was some discussion about reducing wages and paying the cost of transporting the machinery from the Bryan, Texas, plant to the Hannibal plant, but, basically, the loss of production of defendant was such that from the standpoint of management, the inevitable step was to close the Hannibal plant. Defendant also owned at the time two other plants in Hannibal, which had been closed, one of which was being used as a warehouse and the other being partially used as a warehouse. During the fall and winter of 1965 several meetings were held with members of Local 198, and also with the international union, and representatives of the defendant, concerning the closing of the Hannibal plant, which resulted in a letter, dated December 17, 1965, from defendant to the plaintiff advising that the plant would be closed on or before May 31, 1966, the expiration date of the contract.

On December 21, 1965, a representative of defendant had a telephone conversation with a representative of the international union concerning the pension plan then in existence and the effect of the closing of the plant on the pension plan, which provided a contribution by the company for each employee who was working at the Hannibal plant. If the plant closed, no further contribution would be made to the pension plan. This call resulted in a meeting, which was held on January 20, 1966, attended by representatives of Local 198, the international union's expert, and the company. At this meeting there were discussions concerning vacation pay for employees laid off as a result of the closing of the plant and further discussion concerning the pension plan. It was decided to submit the pension plan to actuaries in Clayton, Missouri, for the purpose of getting their suggestions and advice.

During the year 1966, there were eleven grievances filed and they were numbered 1–66 through 11–66. No. 1–66 involved an employee not being permitted to work on Saturday. It was settled by the company making payment. Nos. 2–66, 4–66, and 5–66 involved changing the rubber molds from the first shift to the second shift, and were settled by the parties. No. 3–66 involved a grievance from the union which was filed on February 28, 1966, "the union feels that since the rubber plant is going to close down the company should pay the employees that is quitting for a job of opportunity their vacation pay." On May 12, 1966, Local 198 requested arbitration

on grievance 3–66 and suggested an arbitrator, Professor Elmer E. Hilpert of Washington University. The company accepted Professor Hilpert as an arbitrator and on June 14, 1966, the union withdrew grievance 3–66. On May 14, 1966, the union filed grievances 6–66 and 7–66. No. 6–66 requested the company to recall the employees to work immediately and to contribute eight cents per hour to the pension fund for all hours not worked because the employees were improperly laid off since the layoff was not due to lack of work, but due to the company's decision to move the work from Hannibal to Bryan, Texas. No. 7–66 protested the closing of the plant at Hannibal, stating that it constituted a lockout and deprived the employees of wages and fringe benefits. On June 20, 1966, Local 198 requested arbitration and on June 22nd the company refused to arbitrate.

At the Hannibal plant in April 1966 there were 245 employees, but only 204 at work; in May there were 230 employees, but only 50 actively at work; in June there were 207 employees, but 18 actively at work. Actual production at the plant stopped in the middle of May 1966, and employees were kept on for the purpose of cleaning up and closing up the plant.

Grievances 8–66, 9–66 and 10–66 were filed on May 23, 1966, and were with reference to laying-off not in accordance with seniority and were settled between the company and the union. No. 11–66 was a grievance which had to do with whether or not the employees at Hannibal were entitled to pay for the 4th of July. The company refused to pay for the 4th of July since none of the employees were working prior to that time. This grievance was never pressed by the union further, until it was included in this suit.

The pension plan was ultimately settled in December 1966. Timely notice of the cancellation of the contract was not made until March 20, 1967, effective May 31, 1967. Plaintiff did not communicate further with the defendant concerning the request to arbitrate grievances 6–66 and 7–66 after defendant's refusal to arbitrate in June 1966. This suit was filed in April 1967.

This suit concerns grievances 6–66, 7–66, and 11–66. The complaint requests that the Court enter a judgment requiring the defendant to proceed to arbitration, it asks for $20,000 actual damages, $20,000 punitive damages, and attorney's fees. The company contends that under the contract the closing of the plant is not a matter for arbitration, but is an exclusive prerogative of the company, and, secondly, that the union by its conduct is estopped from asserting the right to arbitrate and has waived the right to arbitrate by its conduct.

In order to determine whether or not the question of closing the plant at Hannibal during May 1966 is a matter which is subject to arbitration, it is necessary to look at the specific clauses in the contract. The purpose of the contract is set out in Article I and reads as follows:

"Article I—Purpose

"It is the desire of the parties hereto to promote co-operation and harmony and to formulate rules for their guidance. It is the intention of the parties hereto that this Agreement shall accomplish these ends and make provisions for the establishment of rates of pay, hours of work, seniority rules and other conditions of employment."

Article III provides the method of handling grievances. Section 2 provides:

"All grievances and complaints presented through the Union, except those pertaining to discharges, disciplinary layoff or suspension, shall be taken up as follows:"

Section 4 provides:

"In the event that any matter covered by this Agreement cannot be set-

tled by joint conference between the company and the Union Representatives it shall, upon written request by either the Company or the Union to the other party, be referred to arbitration; provided, no request for arbitration shall be valid which is not made within ninety (90) calendar days (except when Step 4 of Section 2 is involved, then within 120 calendar days) from original date of written grievance except in discharge, disciplinary layoff or suspension cases when matter must be referred to arbitration within fifteen (15) working days after date of written grievance."

Section 5 provides:

"In the event that arbitration is necessary at any time, unless specifically agreed otherwise, the Union and/or the Company shall, within ten (10) calendar days from date of receipt of written notice, request the Director of the Federal Mediation and Conciliation Service or its successor to appoint an arbitrator. The decision of the arbitrator shall be accepted by both the Company and the Union and shall be final and binding on both. The arbitrator shall have no power to add to, subtract from, or modify any provision of this Agreement or any supplement of or amendment to the Agreement."

Article VIII—Management, reads as follows:

"Section 1. The management of the plant and the direction of the working force, including the right to hire, promote, suspend, transfer or discharge for proper cause and the right to relieve employees from duty because of lack of work or other proper reasons is vested exclusively in the Company.

"Section 2. The Company shall have the sole right to decide the processes of manufacture, types of machinery and equipment to be used, types and quantities of products to be made, quality of material and workmanship required, selling prices of products, methods of selling and distributing products and personnel required in supervisory, clerical and other positions not included in bargaining unit.

"Section 3. The rights of the Company set out in the two preceding sections will not be used for purposes of discrimination against any member of the Union or in a manner contrary to the provisions of this Agreement."

Article IV, section 2, provides in part:

"There shall be no lockout by the Company or stoppage of or interference with work by the Union during the term of this Agreement, * * *"

This contract in question has a broad arbitration clause, providing that "any matter covered by this Agreement shall be referred to arbitration", very similar to the clause in United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The Court in that case, page 584, 80 S.Ct. page 1354, said:

"In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. Since any attempt by a court to infer such a purpose necessarily comprehends the merits, the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator."

The Supreme Court has referred matters to arbitration even after the employer ceased to exist. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). The Supreme Court has required arbitration in cases of merger,

holding that the acquiring corporation also inherited the labor contract, even though it had not signed it. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). The Supreme Court reversed the Seventh Circuit in Piano & Musical Instrument Workers Union, Local No. 2549, etc. v. W. W. Kimball Co., 379 U.S. 357, 85 S.Ct. 441, 13 L.Ed.2d 541 (1964), citing John Wiley & Sons, supra, and United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). The Court of Appeals below at 333 F.2d 761 (7th Cir. 1964), had held that there was no violation during the term of the contract and the matter was not subject to arbitration.

United Steelworkers of America v. American Mfg. Co., supra, states specifically at page 568, 80 S.Ct. at page 1346:

"The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the Court will deem meritorious."

There is no question that this contract was in full force and effect at the time these grievances were filed, since the contract did not terminate until May 31, 1967. There is not such a showing of waiver or estoppel by the plaintiff, that arbitration should be denied. The arbitrator may consider the conduct of both parties in arriving at an equitable decision.

Under the facts and circumstances of this case, regardless of what this Court may think about some phases of this dispute, the Court is of the opinion that defendant should be required to arbitrate grievances 6–66, 7–66, and 11–66.

Request for damages and attorney's fees will be denied.